# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

CHRISTOPHER MORGAN,

        Plaintiff,

vs.

                                  Civil Action No.:  3:17-cv-00045
                                  Judge Norman K. Moon

ON DECK CAPITAL, INC.,

        Defendant.

## CHRISTOPHER MORGAN'S RESPONSE IN OPPOSITION TO ONDECK CAPITAL'S MOTION FOR SUMMARY JUDGMENT

**PLAINTIFF CHRISTOPHER MORGAN**

Michael B. Hissam (VSB #76843)
Ryan McCune Donovan, *pro hac vice*
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
t: 681-265-3802
f: 304-982-8056
mhissam@hfdrlaw.com
rdonovan@hfdrlaw.com

Mass telemarketing is a modern scourge. The Telephone Consumer Protection Act can be a powerful tool for reducing unwanted robocalls, but it involves a constant back-and-forth between the agencies and individuals who would enforce the Act and the telemarketers who develop increasingly slippery technology to circumvent it. This case presents one such attempted evasion.

The TCPA prohibits the use of an "automatic telephone dialing system" (ATDS) to call a cellular phone without the call recipient's consent. The Defendant, OnDeck, uses sophisticated computer software to make thousands of calls to cellular phones every day, including an unsolicited call to the Plaintiff, Christopher Morgan. OnDeck's dialer, made by a company called Five9, has several "modes," many of which plainly qualify as ATDS. But OnDeck seeks summary judgment based on its contention that the particular mode used to call Mr. Morgan was carefully and intentionally crafted to circumvent the ATDS definition.

Thankfully, the drafters of the TCPA saw this evasion coming. They prohibited the use of "systems," not simply modes. And because they defined an ATDS by reference to its capacity, it does not matter which mode was used for a particular call. What matters is what the telemarketer's "system," as a whole, can do. On *that* question, Mr. Morgan has presented substantial evidence that OnDeck's Five9 dialing system fits comfortably within the straightforward ATDS definition:  equipment with the present capacity to dial automatically from a stored list of numbers. For the purposes of this motion, however, it is enough that this Court cannot conclude otherwise—that OnDeck's Five9 dialer system is *not* an ATDS as a matter of law. At a minimum, the factual disputes concerning the contours of OnDeck's Five9 dialer system, and whether its internal software "modes" constitute a "system" that satisfies the statutory definition of an ATDS, cannot be resolved on summary judgment.

In a recent opinion upholding a TCPA jury verdict, Judge Wilkinson called the Act "a simple remedial scheme" and described a telemarketer's crafty arguments as an "attempt to dismember the TCPA." *Krakauer v. Dish Network, L.L.C.*, -- F. 3d --, No. 18-1518, 2019 WL 2292196, at *6 (4th Cir. May 30, 2019). This Court should likewise reject OnDeck's attempted evasion. Because a reasonable jury could conclude that OnDeck's dialing system qualifies as an "automatic telephone dialing system" under the TCPA, OnDeck's motion should be denied.

## I.    BACKGROUND

### A.  The call to Mr. Morgan.

OnDeck is an online lender that offers financing to small businesses. Mr. Morgan is a Virginia resident who owns a small business named Piedmont Hauling, LLC. On June 19, 2017, OnDeck used its Five9 dialing system to place an unsolicited telemarketing call to Mr. Morgan's cellular telephone. To try to stop OnDeck's harassment of him and others like him, Mr. Morgan filed a putative class-action lawsuit alleging that OnDeck's sales department contacted him in violation of the TCPA.

In retaliation, OnDeck criticizes Mr. Morgan as a repeat TCPA litigator, as if that somehow lessens his standing or forgives OnDeck's unlawful activity. But as numerous courts have recognized, consumer advocates like Mr. Morgan are doing exactly what Congress intended them to do—disincentivizing TCPA violations through private causes of action. *See, e.g., Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 881 (8th Cir. 2005) (recognizing that private right of action under TCPA demonstrates Congressional intent to incentivize aggrieved parties to act as "private attorneys general"); *Mey v. Venture Data, LLC*, *245 F. Supp. 3d 771*, 783 (N.D. W. Va. 2017). More to the point, if Mr. Morgan is a "serial" TCPA Plaintiff, then OnDeck is something worse: a serial TCPA *offender*. A search of federal district court dockets reveals that OnDeck has been named in at least five TCPA suits since

2014. *See, e.g., Alvord v. OnDeck Capital, Inc.*, 2:19-cv-177 (D. Utah); *Naiman, et al. v. OnDeck Capital, Inc.,* 3:18-cv-6638 (N.D. Cal.); *Rumbough v. OnDeck Capital, Inc.,* 6:17-cv-1351 (M.D. Fla.); *Childress v. OnDeck Capital, Inc.,* 1:17-cv-79 (D.N.M.); *Jackson v. OnDeck Capital, Inc.,* 1:14-cv-3656 (D. Md.).

**B. The growing problem of illegal telemarketing.**

OnDeck's unwanted solicitations are part of a growing national trend. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC."[1] Indeed, "[t]he FTC receives more complaints about unwanted calls than all other complaints combined."[2] And the problem is only growing worse: in fiscal year 2017, the FTC received 4,501,967 complaints about automated telemarketing, compared with 3,401,614 in 2016.[3] Private litigation and public enforcement have not kept pace with the problem—both the number of calls and the number of complaints increase monthly.

OnDeck's conduct exemplifies this onslaught of automated calls. Using its Five9 dialing system, *a single OnDeck agent can make up to 300 calls per day*—meaning with its 40 sales agents, OnDeck's sales team can make up to 12,000 calls in a single shift and 60,000 calls per week. *See* Brandon Ellison Dep. at 22, 27; attached as Exhibit A**.** In fact, OnDeck's Chief Sales Officer admitted in an interview that the company had recently improved its sales by using the "Five9 autodialer," which allows sales people to make 100 more calls per day.[4]

---

[1] Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

[2] Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016).

[3] Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-nationaldo-not-call-registry-data-book-dnc.

[4] *See* Sales Benchmark Index Interview of Paul Rosen, June 22, 2015, available at https://salesbenchmarkindex.com/insights/case-study-scaling-from-13-million-to-160-million-in-3-years/.  In that

## C. The TCPA's protects; telemarketers evade.

Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the TCPA. Among other things, the TCPA prohibits the use of an "automatic telephone dialing system" to place a telemarketing call to a cellular telephone without the recipient's express, written consent. An ATDS is defined as:

[1] equipment
[2] which has the capacity
[3] to store *or*
[4] produce telephone numbers to be called, using a random or sequential number generator; and
[5] to dial such numbers.

47 USC § 227(a)(1) (emphasis added). Importantly, because the TCPA defines ATDS by reference to its "capacity" to perform certain functions, it is irrelevant whether these functions were actually used for the offending call. In this way, the TCPA remains an effective tool for preventing unwanted telemarketing even as the telemarketing industry develops new technologies specifically designed to enable mass unsolicited calls.

However, as dialing technologies advance, so too do the telemarketer's creative efforts to dodge the TCPA's broad-based prohibitions. For this reason, courts have repeatedly held that the TCPA is a remedial statute that should be construed broadly to benefit consumers and discourage attempted evasions by wrongdoers. *See Krakauer*, --F.3d--, 2019 WL 2292196, at *6.[5] Likewise,

---

interview Mr. Rosen stated: "One of the things that we work real hard as a management team on and this isn't just sales, we're very collaborative with marketing, and with product, with finance, and with credit to find little wins that we can have. A couple of examples is [*sic*], we added a Five9 *autodialer* so our outbound sales people can make 100 more calls per day." (emphasis added).

[5] *See also, e.g., Daubert v. NRA Grp., L.L.C.*, 861 F.3d 382, 390 (3d Cir. 2017) (reiterating "that the statute is remedial in nature and should be construed to benefit consumers"); *Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037, 1047 (9th Cir. 2017); *Ammons v. Ally Financial, Inc.*, 326 F. Supp. 3d 578 (M.D. Tenn. 2018) (providing that TCPA "should be liberally construed and should be interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers"); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 775 (N.D.W. Va. 2017) (same); *Mey v. Honeywell Int'l, Inc.*, 2013 WL 1337295 (S.D.W. Va. Mar. 29, 2013) (same); *Legg v. Voice Media Grp., Inc.*, 990 F. Supp. 2d 1351, 1354 (S.D. Fla. 2014) ("because the TCPA is a consumer protection statute that is remedial in nature, it should be construed liberally in favor of consumers"); *Hitchman v. Nat'l Enter. Sys.,*

the Federal Communications Commission, the agency charged with administering the TCPA, has noted that it "expected such automated dialing technology to continue to develop and that Congress had clearly anticipated that the FCC might need to consider changes in technology." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 566 (2008); *see also Saunders v. Dyck O'Neal, Inc*., 319 F. Supp. 3d 907, 911 (W.D. Mich. 2018) ("Both the FCC and the courts have recognized that the scope of the TCPA naturally evolves in parallel with telecommunications technology as it evolves."). Thus, the FCC, the Fourth Circuit, and courts elsewhere continue to broadly interpret the definition of ATDS so as to effectuate the intent of the TCPA and its intentionally broad text. These principles must likewise guide this Court's application of the TCPA to ensure that the prohibition on autodialers is not circumvented by telemarketers by employing increasingly sophisticated technologies.

### D. OnDeck's Five9 dialing system.

OnDeck's Five9 dialing system is comprised of integrated computer software and hardware used to make tens of thousands of calls every day. While OnDeck's motion focuses on a single mode used by a single department, the system actually includes a number of different dialing modes used by several departments, including Sales and Collections. *See* Tom Nelson Dep. (OnDeck's Rule 30(b)(6) representative) at 45-46; attached as Exhibit B. While the Sales department primarily uses the Five9 dialing system in "TCPA Manual Touch Mode," Collections and other departments make use of other modes within the system, including "Power,"

---

*Inc*., 2014 WL 912363 (S.D. Fla. Mar. 10, 2014) (providing that TCPA a consumer protection statute that is remedial in nature and thus should be construed liberally in favor of consumers); see also *Scarborough v. Atl. Coast Line R.R. Co*., 178 F.2d 253, 258 (4th Cir.1949) (stating generally that "remedial statutes should be liberally construed and should be interpreted (when that is possible) in a manner tending to discourage attempted evasions by wrongdoers.").

"Progressive," "Preview," and "Predictive" dialing modes. *See* Randy Snyder Dep. at ¶ 42, attached as Exhibit C.

At OnDeck's offices, both Sales and Collections agents are housed in the same communal workspace. Ex. B at 36-37. Regardless of department, each OnDeck agent is equipped with nearly identical hardware—a laptop, two monitors, mouse, keyboard, and headset. *Id*. at 46, 66. Each laptop is loaded with the Five9 dialer software, a program called "Salesforce," and a program called the "Five9 Plus Adapter for Salesforce." *Id*.

The Five9 system dials from a list of telephone numbers stored in Salesforce. *See* Ex. A at 36, 38-39; Ex. C ¶ 41. Salesforce is OnDeck's sales account record database. *Id.* ¶ 35. The Five9 dialer and Salesforce platform are fully "integrated" through the Five9 Plus Adapter. *Id.* ¶ 39; Ex. B. at 50-51; Five9 Plus Adapter Agent's Guide at 000061, attached as Exhibit D. The Five9 dialer is thus dependent upon the Salesforce platform, which provides a common pipeline of stored telephone numbers regardless of which dialing mode is being used or which department is making the call. Ex. C. ¶ 41.

While the Sales and Collections departments use the same Five9 dialer, each department has a designated Five9 "domain." *Id.* ¶¶ 49-52. The domains dictate which dialing modes are available to the end user. *Id*. While operating within the Sales domain, agents have access to more limited dialing modes. Ex. B. at 68-69. On the other hand, if an agent is logged into the Collections domain, she has access to automated and predictive dialing modes. *Id*. Multiple domains can be accessed from the same physical workstation, thereby giving the end user access to the varying automated dialing modes no matter the department. Ex. C. ¶ 52. And switching between domains takes no more than 30 seconds—the agent simply signs out of one domain and into the other. Ex. B at 72-73 (explaining procedure for switching between Sales and Collection

domains); Snyder Decl. ¶ 43 ("Any of the dialing mode functions, including the automatic dialing modes, are accessible by call center agents through the Five9 Adapter software").

The relationship between the various aspects of the system can be illustrated as follows:



By focusing its arguments solely on the not-so-subtly named "TCPA Manual Touch Dialing Mode," OnDeck invites the Court to overlook the automated capabilities of the other dialing modes available to OnDeck agents. Predictive Dialing Mode, for example, provides for "the automation of outbound activities and maximizes agent productivity by automatically

detecting and filtering out unreachable numbers, such as those with busy signals, operator intercepts, and no-answers." *See* Five9 Campaign Administrator's Guide at 47, attached as Exhibit E. Likewise, Power Dialing Mode uses a "dialing algorithm [which] reserves agents as they become available for calls and continuously dials at the configured rate, until live persons are connected with the agents. The dialer automatically detects and filters out unreachable numbers." *Id*. at 50.

By comparison, the Manual Touch Mode purports to interject minimal human intervention for the sole purpose of evading TCPA prohibitions. In Manual Touch Mode, Salesforce automatically picks the agent's next lead and automatically populates the number into the dialer system. Def.'s Br. at 8-9. Once the number is automatically populated, the dialer prompts the agent to re-key the populated number directly below the auto-populated field. *Id*. The call will not be initiated unless the phone number is correctly regurgitated by the agent—a redundant exercise taking less than 5 seconds to complete. Ex. A. at 50-52.

This trivial exercise has no legitimate purpose. Rather, it is intended to insert *just enough "human intervention"* as to thwart the TCPA. This exercise in futility, however, is of no consequence because, as explained below, a jury must evaluate the present capacity of the Five9 dialer system as a whole rather than some particular dialing mode in isolation. On that point, it matters not whether one relies on OnDeck's own testimony, Five9's own descriptions, or the Plaintiff's expert. As explained further below, the conclusion is the same: OnDeck's Five9 dialing *system* is an ATDS because it plainly "has the capacity to perform automatic dialing using stored telephone numbers to be called." Snyder Decl. ¶¶ 56-57.

## II. ARGUMENT

**A. The TCPA regulates dialing "systems," not dialing "modes," and all of OnDeck's dialing modes are part of the same Five9 dialing system.**

In its description of the Five9 dialer, OnDeck focuses exclusively on the capabilities of the dialer's "Manual Touch *Mode*." As the statutory term "automatic telephone dialing *system*" dictates, however, the proper analysis requires this Court to analyze the capacity of OnDeck's dialing system as a whole, including all its constituent dialing functions.

The TCPA does not define the word "system." When a term in a statute is left undefined, it must be "interpreted as taking the ordinary, contemporary, common meaning." *Johnson v. Zimmer*, 686 F.3d 224, 232 (4th Cir. 2012). Courts "customarily turn to dictionaries for help in determining whether a word in a statute has a plain or common meaning." *Id.* (quoting *Nat. Coalition for Students v. Allen*, 152 F.3d 283, 289 (4th Cir. 1998)). Webster's defines a "system" as "a regularly interacting or interdependent group of items forming a unified whole." "System," *Merriam-Webster.com,* https://www.merriam-webster.com/dictionary/system.

Undefined words must also be interpreted within the context of the statute and consistent with its overall purpose. *Johnson*, 686 F.3d at 235 ("[O]ur obligation is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested."). Again, the TCPA is a "remedial statute" that "should be construed to benefit consumers." *Daubert v. NRA Group, LLC,* 861 F.3d 382, 390 (3d Cir. 2017). Adopting a narrow definition of the term "system" that would allow telemarketers to duck liability by isolating certain compliant modes and ignoring ones with ATDS characteristics would violate that principle.

Within this framework, a reasonable jury could easily find that all of OnDeck's dialing "modes" are part of the same Five9 dialing "system"—that is, that the Power, Progressive,

Predictive, and Preview Modes used by the Collections department, as well as the "TCPA Manual Touch Mode" used by the Sales department to call Mr. Morgan, make up "a regularly interacting or interdependent group of items forming a unified whole."

Substantial evidence would support that conclusion. *See supra,* Pt. I.B. Regardless of the dialing mode in use at any given time, OnDeck's agents make calls from the same room, using the same hardware. Every agent's computer also has the same software. Though OnDeck makes much of the fact that each dialing mode resides on a separate "domain," every Five9 domain is dependent on the Salesforce lead pipeline and, critically, "integrated" into the overall system by the Five9 Plus Adapter for Salesforce. Likewise, OnDeck's misplaced reliance on the fact that each domain requires a separate log-in and password is undercut by the testimony of an OnDeck employee that it takes less than thirty seconds to log out of one mode and into another. Moreover, Five9 itself refers to all of the various dialing modes as part of a single "Five9 Virtual Contact Center." Ex. E.

A jury's conclusion that OnDeck's multiple dialing modes comprise a single system would also be supported by reliable expert testimony. According to Mr. Snyder: "The [Manual Touch Mode] dialing function is just that—a software dialing function, along with the other dialing mode software functions: predictive, power, progressive, and preview mode software functions. *A dialing 'mode' is simply a software function within the overall dialing system equipment.*" Ex. C. ¶ 46 (emphasis added). Mr. Snyder's conclusion in that regard is based on his extensive experience with telemarketing equipment and his specific findings that, among other things:

- OnDeck's Salesforce account record database is "inextricably integrated with the Five9 dialing system" via the Five9 Adapter software, "regardless of the dialing mode used, *id.* ¶¶ 39, 40, 48;

- Indeed, "the Five9 dialing system is not accessible without using Salesforce via the Five9 Adapter," *id.* ¶ 41;

- The various software functions within the Five9 dialing system share the same physical hardware, id. ¶ 47;

- The separate "domains" housing different dialing modes are merely fictional barriers, because they are all "part of a the single, cloud-based system and network infrastructure," *id.* ¶ 51; and, as evidence of that false distinction,

- The multiple domains and modes of the Five9 dialing system can be accessed using different login credentials from the same physical workstation and user interface software, *id.* ¶ 52.

OnDeck's motion for summary judgment does not even address the other dialing modes that make up its Five9 dialing system. In its reply, OnDeck will probably advocate for a definition of the term "system" that would allow the Court to analyze the Manual Touch Mode in isolation. Other courts, however, have rejected similar ploys to "circumvent the TCPA's prohibitions simply by disaggregating the functions of an automatic dialer into nominally separate, but functionally complimentary systems." *Heard v. Nationstar Mortg. LLC,* No. 2:16-CV-00694-MHH, 2018 WL 4028116, at *6 (N.D. Ala. Aug. 23, 2018); *see also Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011).

OnDeck will also likely rely on the testimony of its own expert, Dr. Adam Sorini, concerning the relationship between the various parts of its Five9 dialing system.[6] But the

---

[6] Dr. Sorini's testimony lacks credibility for a number of reasons. Mr. Sorini works for a company called Exponent, Inc., a "science-for-hire giant" that has long come under fire for controversial testimony in support of industry clients. *See* "Big Companies in Legal Scrapes Turn to Science-for-Hire Giant Exponent," Business Ethics, Dec. 13, 2016; available at http://business-ethics.com/2016/12/13/1724-big-companies-in-legal-scrapes-turn-to-science-for-hire-giant-exponent. Among other "highlights," Exponent "scientists" opined on behalf of tobacco producers that secondhand smoke does not increase the risk of lung cancer. *Id.* In another case, a federal judge in Ohio excluded the testimony of one of the firm's scientists after finding that she had excluded test results unfavorable to her client. *Id.* Dr. Sorini himself has never once testified for a non-commercial plaintiff, nor can he recall a single time when he was asked to do an analysis and reached an ultimate conclusion with which his client disagreed. Sorini Tr. at 47, 74, attached as Exhibit F. And rather than formal training or hands-on background, his experience with autodialers is limited to his work as an expert witness. *Id.* at 11-18, 22, 34-41.

probable conflict between Mr. Snyder's testimony and Dr. Sorini's only highlights the fact that the question of whether the Manual Touch Mode is part of a larger, unified dialing system cannot be decided as a matter of law. Mr. Snyder's testimony, and all the other evidence that OnDeck's integrated dialing modes and functions are part of a "regularly interacting or interdependent group of items forming a unified whole" must be weighed by the finder of fact.

## B. OnDeck's Five9 dialing system is an ATDS.

When viewed as a "unified whole" comprised not only of Manual Touch, but also Power, Progressive, Predictive and Preview dialing modes available to OnDeck calling agents, a jury could easily conclude that the OnDeck Five9 dialing system qualifies as an ATDS. The Plaintiff's expert will testify that the Power, Progressive, Predictive and Preview software functions have the capacity to dial numbers automatically from a stored list, without human intervention, and many courts analyzing similar systems have agreed. Moreover, even the Manual Touch Mode itself is not a "true manual dial[er]." Ex. C. ¶ 44. Accordingly, OnDeck's motion for summary judgment should be denied.

### 1. Equipment that dials numbers automatically from a stored list is an ATDS.

#### i. The plain language of the statute must be broadly and reasonably interpreted.

To meet the statutory definition of an "automatic telephone dialing system," equipment need only have the present capacity to "store *or* produce telephone numbers to be called, using a random or sequential number generator[,] and to dial such numbers." 47 USC § 227(a)(1) (emphasis added). In other words, equipment can satisfy the ATDS definition in one of two ways: it can (1) store numbers to be called, and dial them automatically, *or* (2) generate random or sequential numbers, and dial them automatically.

In its motion, OnDeck asks the Court to adopt an unduly narrow interpretation of the statutory definition under which equipment could be deemed an ATDS only when it uses a random or sequential number generator. That just doesn't make sense. As other courts have explained, telephone numbers cannot be *stored* using a random or sequential number generator. *See Dominguez v. Yahoo, Inc.,* 629 F. App'x 369, 372 n.1 (3d Cir. 2015) ("[I]t is unclear how a number can be stored (as opposed to produced) using a random or sequential number generator."). Accordingly, OnDeck's narrow interpretation would either produce an absurd result, or require the elimination of the word "store" entirely. Neither is a sound approach to statutory interpretation. *See Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available"); *E.E.O.C. v. Firestone Fibers & Textiles Co*., 515 F.3d 307, 313 (4th Cir. 2008) (rejecting statutory interpretation that required ignoring a word in the statutory text).

Moreover, OnDeck's proposed interpretation is inconsistent with the Fourth Circuit's repeated instruction that the TCPA be broadly construed. *See Krakauer,* --F.3d--, 2019 WL 2292196, at *8 ("The extensive legislative history accompanying the TCPA confirms its broad reach."); *See also Carlton & Harris Chiropractic, Inc.* 883 F.3d 459, 474 (4th Cir. 2018) (Thacker, J., dissenting) ("Because the TCPA is a remedial statute, it should be liberally construed and interpreted in a manner tending to discourage attempted evasions by wrongdoers." (internal citations and quotations omitted)).[7] To Mr. Morgan, the statutory definition is clear. But if there is any ambiguity at all, the Court must reject OnDeck's unreasonable and unduly narrow interpretation.

---

[7] Though Judge Thacker dissented in *Carlton & Harris Chiropractic, Inc.*, this particular quotation is consistent with the majority's holding.

### ii. The Plaintiff's definition of an ATDS is supported by binding FCC rulings.

Consistent with the above, the FCC has steadfastly ruled that the definition of ATDS includes systems that dial from a stored list of telephone numbers. The agency has addressed this issue on a number of occasions over the past two decades:

- **In its 2003 Order,** the FCC ruled that a predictive dialer falls within the TCPA's definition of an ATDS. The Order provided that: "a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. *As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment*, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call."

*See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (2003) (emphasis added).

- **In 2008, an FCC Order** "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." The Order expressly rejected the industry's argument that "a predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists."

*See In re Rules &Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559 (2008).

- **Again, in its 2012 Order,** the FCC reiterated that the ATDS definition "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 15391, at n.5 (F.C.C. Nov. 29, 2012).

*See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830 (2012).

Critically, these agency decisions are not just persuasive, but *binding* on any federal district court. As the Fourth Circuit recently recognized, "the Hobbs Act specifically vests the federal courts of appeals with exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of the orders to which it applies, including FCC interpretations of the TCPA." *Carlton & Harris Chiropractic, Inc.,* 883 F.3d at 464 (internal quotation marks omitted). As a result, district courts "lack[] the power to consider in any way the validity" of the FCC's interpretation of the ATDS definition. *Id.*

In its motion, OnDeck contends that the 2003, 2008, and 2012 orders were wiped away by a recent decision of the D.C. Circuit. But that is not correct. In *ACA Int'l v. Fed. Commc'n Comm'n*, 885 F.3d 687 (D.C. Cir. 2018), the court set aside only some portions of the FCC's *2015* Order concerning the definition of an ATDS.[8] The opinion did not purport to set aside any of the earlier orders, nor could it have done so: under the Hobbs Act, any challenge to an FCC order must be filed with sixty days of the order's entry. 28 U.S.C. § 2344. Thus, in the last year, many courts have concluded that *ACA International* is best understood as doing no more than rolling the clock back to 2014, when the 2003, 2008, and 2012 interpretations of the ATDS definition were securely in place.[9]

---

[8] The portion of the 2015 Order that was set aside has no bearing on this case. In *ACA International,* the D.C. Circuit concluded that the FCC went too far when it ruled that the term "capacity" in the statutory definition referred to any "future capacity" and not just the "present" capabilities of the equipment. Here, the Plaintiff does not rely on any "future" or "potential capacity" theory. Rather, as explained below, Mr. Morgan contends that OnDeck's Five9 dialer has the present capacity to function as an ATDS.

[9] *See, e.g., Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578 (M.D. Tenn. 2018); *Reyes v. BCA Fin. Servs.*, Inc., 312 F. Supp. 3d 1308, 1321 (S.D. Fla. 2018) ("BCA Financial reads too much into ACA International when it concludes that the prior FCC orders can no longer be relied upon. The Court rejects that argument for several reasons. First, nowhere in the D.C. Circuit's opinion are the prior FCC orders overruled. Indeed, that would have been impossible given that the time to appeal those orders had long passed. And when addressing those prior orders,

### iii.  Other courts agree with the Plaintiff's ATDS definition.

Although the plain language of the statute and the FCC's binding orders are enough, it is also worth noting that many federal courts have agreed with the Plaintiff's position. In *Marks v. Crunch San Diego, LLC*, for example, the Ninth Circuit held that "the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a random or sequential number generator, but also includes devices with the capacity to dial stored numbers automatically." 904 F.3d 1041, 1052 (9th Cir. 2018) (internal quotation marks omitted). Other courts have held the same. [10]

### 2.  Viewed as a whole, OnDeck's Five9 dialer system has the "capacity" to automatically dial numbers from a stored list.

The Administrator's Guide for OnDeck's Five9 dialing system describes its available dialing modes as follows:

> **Power Dialing Mode:** The dialing algorithm reserves agents as they become available for calls and continuously dials at the configured rate, until live persons are connected with the agents. The dialer automatically detects and filters out unreachable numbers, such as those with busy signals, operator intercepts, and

---

the D.C. Circuit merely said that it had jurisdiction to address the recent pronouncements and clarifications issued in 2015, not whether the 2003 and 2008 orders remained valid."); *Maes v. Charter Commc'n*, 345 F. Supp. 3d 1064 (W.D. Wis. 2018) (holding that 2003 order is still valid and predictive dialer is an ATDS); *Ramos v. Hopele of Ft. Lauderdale, L.L.C.*, 334 F. Supp. 3d 1262, 1272 (S.D. Fla. 2018); *Wilson v. Quest Diagnostics*, 2018 WL 6600096 (D.N.J. Dec. 17, 2018) (*ACA International* only struck down the expanded interpretation in the 2015 order, and left the 2003 and 2008 orders in effect); *Somogyi v. Freedom Mortg. Corp.*, 2018 WL 3656158, at *5 (D.N.J. Aug. 2, 2018); *Glasser v. Hilton Grand Vacations Co.*, 341 F. Supp. 3d 1305 (M.D. Fla. 2018) (*ACA International* left FCC's pre-2015 orders intact); *Maddox v. CBE Grp., Inc.*, 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018) ("Given the *ACA Int'l* decision, the Court relies on the FCC's 2003 interpretation of § 227(a)(1) to determine if Defendant's system qualifies as an ATDS."); *Swaney v. Regions Bank*, 2018 WL 2316452, at *1 (N.D. Ala. May 22, 2018) ("In *ACA International*, the D.C. Circuit invalidated certain portions of the 2015 FCC Order, but not the portion of the Order reaffirming the FCC's 2003 determination that, 'while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS.").

[10] *See, e.g., Duran v. La Boom Disco, Inc.*, 2019 WL 959664, at *10 (E.D.N.Y. Feb. 25, 2019) (concluding that device need not generate random or sequential numbers); *Adams v. Ocwen Loan Servicing, LLC*, No. 18-81028-CIV, 2018 WL 6488062, at *3 (S.D. Fla. Oct. 26, 2018) (same); *Getz v. DIRECTV, LLC*, No. 18-22802-CIV, 2019 WL 850254, at *5 (S.D. Fla. Feb. 20, 2019) (same); *Heard v. Nationstar Mortg. LLC*, No. 2:16-CV-00694-MHH, 2018 WL 4028116, at *6 (N.D. Ala. Aug. 23, 2018); *Gonzalez v. HOSOPO Corp.*, No. 18-10072, ECF 114 — WL — (D. Mass. April 9, 2019) (same).

no-answer calls, and avoids do-not-call (DNC) numbers to ensure compliance with regulations.

**Predictive Dialing Mode:** The Predictive Dialer allows the automation of outbound activities and maximizes agent productivity by automatically detecting and filtering out unreachable numbers, such as those with busy signals, operator intercepts, and no-answers, avoiding do-not-call numbers to ensure compliance with regulations, and automatically adjusting the dialing pace. The dialing pace is automatically determined, according to predicted agent availability and other statistics, and the dialer attempts to keep the campaign below the configured Dropped Call Percentage.

**Progressive Dialing Mode:** Progressive Dialing mode dials at a variable Calls-to-Agent ratio based on campaign statistics and begins dialing when an agent becomes ready for calls. The Calls to Agent ratio is automatically adjusted to maximize agent utilization, while attempting to stay below the configured Max Drop Call Percentage.

**Preview Dialing Mode:** Use Preview Dialing mode as an alternative to the automatic dialing modes to give more control over dialing to agents. Preview Dialing is often used in sales-oriented call center operations, where agents have more frequent and personal interaction with contacts.  Preview Dialing mode does not filter undesired call results, such as busy signals or operator intercepts.  Instead of automatically dialing numbers from a list and delivering connected calls to agents, an agent receives the contact record before any number is dialed. The agent can review the contact record details before a call is made.  Agents can be allowed to skip records which they preview.

**TCPA Manual Touch Dialing Mode:** TCPA Manual Touch Dialing mode is the only dialing mode available in TCPA Manual Touch domains; it is not a dialing option for domains other than TCPA Manual Touch domains. TCPA Manual Touch Dialing mode is a strict version of the Preview Dialing mode where contacts are presented to the agent for dialing, but no automatic dialing takes place to external customer numbers. Agents can review the contact details of an automatically assigned record and initiate the dial or skip the record. The TCPA domain is generally used for telemarketing campaigns to dial cell phones when the

> business does not have expressed consent to call the customer on their cell phone.

Exhibit E at 45-59. There can simply be no dispute that many, if not all, of these modes are capable of dialing automatically from a stored list of numbers, thereby qualifying as an ATDS.

Five9's own language is damning. In "Power" mode, "the dialing algorithm . . . continuously dials . . . until live persons are connected with the agents." Five9's "Predictive" mode "allows the automation of outbound activities" and "the dialing pace is automatically determined." "Progressive" mode dials automatically at a "variable ratio" that is "automatically adjusted" based on updated data. And "Preview" mode gives "more control" to live agents, because, *unlike the preceding modes,* it does not "automatically dial[] numbers from a list." These words alone, from Five9's mouth to the jury's ears, are a sufficient basis for the finding that the OnDeck dialing system is an ATDS.

In addition, the Plaintiff's expert will testify that OnDeck's system, including these modes, has the capacity to store telephone numbers to be called, and to dial such numbers. Ex. C ¶ 11. Specifically, Mr. Snyder has opined that Power, Progressive, Preview, and Predictive dialers are all well-known types of autodialers with the characteristics of an ATDS. *Id.* ¶¶ 14-28. Other courts have agreed with Mr. Snyder's analysis. *See, e.g., Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, 2018 WL 3707283 at *6 (N.D. Cal. 2018) (denying defendant's motion for summary judgment based on Mr. Snyder's expert testimony that defendant used "several types of automatic telephone dialing software services, including predictive dialing, power dialing, progressive dialing, and preview dialing services").

Finally, OnDeck's own frank concession that it uses an autodialer is "alone . . . sufficient to preclude summary judgment on the ATDS issue." *See Mey. v. Venture Data, LLC,* 245 F. Supp. 3d 771, 789 (N.D. W. Va. 2017). In an interview unrelated to this litigation, OnDeck's

Chief Sales Officer bragged to a reporter that that the company had improved its sales by using the "Five9 autodialer," which allows Sales department agents to make 100 more calls per day.[11] As the *Mey* court explained, "a reasonable juror could credit [OnDeck's employee's] candid admission over subsequent denials made for the purposes of litigation." *Id.*

For these reasons, OnDeck's motion should be denied.

### 3. Even when viewed in isolation, OnDeck's Manual Touch Mode qualifies as an ATDS.

As explained above, when OnDeck's various dialing modes are viewed as the unified system that they are, there is no doubt that a jury could conclude that it meets the statutory definition of an "automatic telephone dialing system." But a jury could also find that the Manual Touch Mode used to place an unwanted call to Mr. Morgan is an ATDS in its own right.

As the name suggests, Five9's "TCPA Manual Touch Mode" is intentionally designed to allow a telemarketer to engage in mass dialing campaigns while sidestepping the scope of the TCPA. In that effort, however, Manual Touch Mode falls short.

Like every other Five9 dialing mode, Manual Touch Mode draws from a list of numbers stored in Salesforce. When an agent logs in, those numbers are automatically loaded into the Five9 dialer. After that, the only difference between Manual Touch Mode and other, indisputably-ATDS dialing modes is that Manual Touch Mode requires the agent to re-key the target's 10-digit number before dialing—a trivial exercise designed for the sole purpose of creating a technical defense to a TCPA claim.

OnDeck contends that the act of re-keying a telephone number—which takes 5 seconds or less—injects sufficient "human intervention" into the process such that the call cannot have been "automatically" dialed. But in light of the Fourth Circuit's recent command to liberally

---

[11] *See supra,* n.4.

construe the TCPA in a manner consistent with its "broad" remedial purpose, the Court should reject OnDeck's blatant gamesmanship. *See Krakauer*, --F.3d--, 2019 WL 2292196, at *8. Rather than interpreting the law to encourage TCPA compliance through clever evasion, the Court should require the kind of compliance Congress actually intended: if a company wants to make an automated telemarketing call to a cellular phone, it should ask for the call recipient's express consent.

## III. CONCLUSION

Because the Five9 dialer is a "system" that has the "capacity" to perform all the functions required of an ATDS under the plain text of the TCPA, OnDeck's motion for summary judgment should be denied.

CHRISTPHER MORGAN

By Counsel:

/s/ Michael B. Hissam
Michael B. Hissam (VSB #76843)
Ryan M. Donovan (admitted *pro hac vice*)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
t: 681-265-3802
f: 304-982-8056
mhissam@hfdrlaw.com
rdonovan@hfdrlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2019, I served a true and correct copy of the foregoing via the Court's ECF system, which sent electronic notice to all counsel of record.

/s/ Michael B. Hissam